Brian, please proceed. Thank you. Good morning and may it please the court, your honors. I'm Patrick Bryant and together with my colleague Lauren Shuman representing John Burton this morning. We're happy to talk about any of the issues that we've raised in our briefs, but I'd like to focus on three today. One, the seizure of Mr. Burton's phones. Two, the warrants that the police obtained to search Mr. Burton's phones and his home. And then finally, the good-faith exception. So turning first to the initial seizure of Mr. Burton's phones, the government relies on the exigent circumstances exception to justify that seizure, but that exception doesn't apply unless there is something preventing the police from obtaining a warrant when they enact the initial seizure. And in this case there wasn't. I think it's important to be clear about the timeline of events. The incident at the grocery store happened on a Friday afternoon. Mr. Burton spoke with the police by telephone that day. The police did nothing over the weekend and into Monday, and then they called him in to the station and asked him to come in on Tuesday. In all of that span of time, they took no efforts to secure the phone. They didn't go to his house. So if there was some great emergency in seizing these phones and freezing them in place, they made no efforts to do so. Then on Tuesday, the meeting started about noon and finished about 12.30. There was a suppression hearing here? I'm sorry? There was a suppression hearing? Yes, that's correct. With respect to an exigent circumstances determination, what kind of respect do we owe the district judge's finding of exigency? The facts underlying that conclusion are reviewed for clear error, but the ultimate conclusion I think is a question of law about whether exigent circumstances actually exist. But doesn't the district court get a feeling for the exigency of a matter of listening to the various parties? Well, the court is there to see the witnesses and hear the evidence, but that's all obviously in the record here. And the question, it's an objective standard whether it was reasonable for the police to do what they did and to seize the phones without a warrant. And what the police did is solid evidence of whether they believed there was an emergency, and it's good evidence of whether a reasonable officer would have believed that he had to take the phones immediately. With the phone, there was the intrinsic characteristic of the instrument that it was subject to electronic transfer, right? And they had a witness who had identified Mr. Burton, had they not? That's correct. Okay. And so I'm really struggling to figure out why they wouldn't seize the phone. If the information could be downloaded to another electronic device and they had a positive identification of your client as the person who had taken that upskirt photo, what would be the basis for not having a concern that the electronic contents of that phone could be immediately transferred, any photographs taken? Well, I have a couple of responses to that. I understand your argument about the breadth of the warrant, but in terms of the exigency, I mean, wouldn't it have been malpractice to send the phone home with him once they had a positive ID by a witness? Well, they had that by Friday, and they didn't do anything. They didn't take any steps until Tuesday to actually seize the phones. So they certainly didn't act as if there was any ongoing emergency. Mr. Burton, in fact, voluntarily came to the police station and brought the phones with him. He had not destroyed them. He had not thrown them in the river. And so... What are you saying they should have done? They should have gotten a warrant to take the phones rather than seize them without a warrant. And so that also plays into our unreasonable delay argument that even... Because they could, I don't mean to cut you off, but so are you saying then because they could have gotten a warrant, they had to have gotten a warrant? Unless...  Well, yes, they certainly play together. And so perhaps not literally at the exact moment they obtained probable cause, if there's something actively preventing them from acting any sooner, and here there wasn't. And so... I mean, my recollection, and do correct me, is that this was not the only thing that these officers were engaged in. There were other things that the officers were working on that demanded their attention as well. I'm happy to... And you do have the intervening weekend. So I'm a little unclear. It does not seem to me that given what was at play and given the ready destructibility or rendering inaccessible information they are on of a device like a mobile phone, that the delay was unreasonable. A couple of responses to that. I'm very happy to address that because, first of all, no court has held that a phone is inherently immediately seizable. That wasn't my question. No, I understand. I do understand. And so with respect to the other police activities, first of all, the magistrate was available 24 hours a day, seven days a week. The police officer... The police officers, as I recall, were engaged in other investigations. Not until after. The record is very clear. After the seizure. The record is very clear. I'll explain. I am getting to that, I promise. The meeting and the seizure happened on Tuesday and the seizure was complete about 12.30. That police report starts at page 59 of the record on Tuesday. The evidence was very clear that Detective Myrick did not get the other assignments to investigate the larcenies and robberies until Wednesday, the next day. So, now I'm not denying that he might not have other duties, but that doesn't mean that this can go on the back burner when they take someone's property without a warrant. And so... They gave him a chance to be interviewed. You see what I'm saying? I mean, they gave him a chance to give his side of the story before they seized the cell phone. I mean, are you saying that they should have gotten the warrant for the cell phone on Friday when they knew that he... or they had evidence, significant evidence, that he was involved in this activity? They certainly could have tried to do that. And if there was really an exigency and if they were really worried about the ready destructibility of the phone, they could have and should have done that. They could have, but that doesn't necessarily... the fact that they could... you seem to equate the fact that they could have and the fact that they should have. And there was testimony by the detective about activities prior to the hearing. I think the problem that I'm having, at least, is the fact that it is conceivable that they could have gotten to it sooner doesn't mean that it necessarily should have been gotten to sooner. I understand that. And we've said in our brief that we're not saying that they have to act at the very moment that they're capable of acting, but they can't unreasonably delay acting. But your answer assumes the validity of your objection. You put in unreasonably. And so you've made the determination in describing the delay that it was unreasonable. And that's to be determined. Well, they're really... here are two sides of the same coin, the seizure and the delay. Because one feeds into the other. If it was so emergent that they had to have these phones imminently, then why wait so long and two additional days to get a warrant? That's what makes it all unreasonable. And it also is evidence that they didn't need to act so fast in seizing the phones. This is one of the shorter periods of delay. I mean, you have the Pratt case where you have 30-day delays and month delays. I mean, we all have these delay cases. And I don't think there are many cases out there finding that a two-day delay was unreasonable and overturning a district court's finding to the contrary. Well, it's certainly fact-specific. And there's the Place case where it was a 30-minute delay is unreasonable. And in the cases where there are longer delays, usually what's happening is there's additional investigation or the police are consulting with prosecutors. And here, my response to your question, Judge Keenan, is that the officers did bring him in to have an interview, but there's nothing that they learned or that changed anything. You know, if you want the police to do a credible job, it does take some time sometimes to prepare an affidavit and to prepare a... you know, you can't just order one up. Well, Your Honor... Or you would have fast food order. Well, these... the warrants and affidavits are in the appendix and they're fairly bare bones. They're pretty skimpy. And it did not... it would not have taken two days to type this out. And there's no indication... I'm sorry. I'm sorry, I can't hear you. No, no. No, I was just going to say there's no indication that the officer was incapable in any way of going to get a warrant any sooner. The thing about this officer is when you look at the sequence of events as a whole, this was... doesn't seem to me this was somebody that was just sort of looking to run wild. He... I suppose there were some officers who, after seizing the phone, would proceed to search it. But this officer did not do that. He went and got a warrant. He got a warrant to search the phone. He got a warrant to search the home. I mean, he's trying to play things by the book. He's not trying to circumvent in any of these sequences the need to get a warrant. Why would we sort of bang down on somebody who is... waits two days to get a warrant? You know what? The next police officer will say, well, what the heck? The courts are saying two days is too long a delay. Why should I bother with getting a warrant? I'll just search the phone right away. There'd be no unreasonable delay there. Well, that would be an independent violation. So I'd like to turn to the warrants that the police obtained. The warrant for the phone and the warrant for the house, and the house in particular, were drastically overbroad and not particularized to satisfy the Fourth Amendment. These warrants to search the entire contents of the phone or the entire contents of the home are general warrants, and the Constitution requires that they be limited to only the time, the place, the type of data that they have probable cause for, and not a general rummage. What about the phrase that you use, the type of data? Isn't this type of data? Also, you're dealing here with someone with a fairly decent knowledge of data. I think it was pretty much conceded that he had a degree of sophistication with respect to the mobility of the data, and there's so many ways to delete, to hide and confiscate cell phones, to delete data, to perhaps, you know, they can take the mobility of the data into account. If you were dealing with a different item, let's say you're dealing with a weapon or a gun, or whatever, you would have a different kind of argument. The mobility of the data and the way it can be shifted from here and there and deleted and all the rest. Even assuming that's so, that would only apply, they had probable cause to search for digital files, they were looking for photographs, but the scope and scale of these warrants would allow them to look at every piece of paper in his home, every piece of paper on his computers. What about the good faith exception? How do you get beyond that? Because I think that's really the crux, or at least arguably the crux. Does the district court agree with you about the breadth of the? That's correct. And so I am happy to address good faith. And so the district court relied on Riley in applying good faith, but that's, I think, completely inapplicable here. First of all, Riley didn't have anything to do with houses, so I don't think that reliance on Riley could show a good faith exception for the warrant to search the house. But in any event, even before 2011 when these devices were searched, the general warrants to search all contents without any limitation put on them by the magistrate. Leon says we don't ask district judges to, and we don't ask police officers to second guess magistrates. What we ask them to do is to submit affidavits to magistrates for the magistrate to turn to the sufficiency. But Leon makes this point over and over, he said it's going to be rare that a police officer who gets a warrant and follows a warrant will be found to have acted in bad faith. And the reason is police officers are not supposed to, they don't have the duty to second guess magistrates. What their duty is is to submit the sufficiency of what they have to a magistrate, not to second guess a magistrate. But our argument is that any reasonable police officer, even at the time of these searches, would have known that it's, there's no probable cause or particularity on the face of these warrants that a reason, and Leon preserves that as an exception to the good faith exception. Can I ask, please, this is an, this case, the facts occurred in 2011. That's correct. And it's, what deterrent effect would throwing out the warrant now have, especially given the evolution of our understanding about the scope of electronic data maintenance? Well, it hasn't expanded that far from 2011. Even in 2011 they knew, but particularly with regard to the deterrence factor, the problem is blessing these warrants would give the police every incentive to always ask to search everything. And what we would end up with is, the analogy I think of is the archer who fires an arrow and then paints the bullseye around where it landed. And we turn the process on its head if the police say let us search for everything and if we turn. I'm not sure you can make, I'm not sure that there is significant support for the breadth of that assertion because as the district court found and as other cases have found, 2011 is the dark ages, relatively speaking, given the rapidity of technological advance. So what people might have known then is vastly different, speaking just for myself, what I would have known then is vastly different from what I know now, which still isn't nearly enough. You take my point. What message would we be sending in 2018 with respect to these actions which occurred in 2011? Because even in 2011, the police should have known, even in 1787, the police should have known that a general warrant to search the entire contents of someone's house is overbroad in particular. I'm not talking about just one photograph because as a result of the cell phone search, the police, which they had a warrant for, the police officer knew that this wasn't just a one-off photograph, as bad as that was. They knew as a result of that cell phone search that he was a serial offender and that he had taken multiple photographs of this nature. And so it wasn't simply a search for one. It was a search quite reasonably for a whole cache of illicit photographs. Well, and our argument simply, Your Honor, is that the warrant to search for that still has to be limited more than these warrants. And I've reserved some time if there's nothing additional at the moment. Well, I don't know. Given our Williams case, you can address Williams when you come back. All right. Thank you. Mr. Cook. May it please the Court. I'd like to start briefly with the exigency argument. And I think the defendant's argument there runs headlong into Kentucky v. King. And Kentucky v. King leaves the police latitude to make the kind of decision that the detective did in this case, which is he wanted to find out what the defendant's version of events would be before he proceeded any further. And it was perfectly reasonable for him to confront the defendant and ask him, you know, his description of what happened. And on the defendant's view, what should have happened apparently was that before even hearing the defendant's side of things, the police should have gone and obtained a warrant. But it's Kentucky v. King leaves the police latitude to choose among different investigative routes that are permissible. What's the limiting principle that you will acknowledge when it comes to the evidence under exigent circumstances? What are the confining boundaries of that principle from the government's perspective? Well, one really big one is the distinction between simply seizing evidence to go get a warrant and using exigency to conduct a search outright. And in Riley, the Supreme Court noted that there could be circumstances where an out-and-out search of the phone, for example, under exigency could make sense. That's probably going to require more gravity in terms of what is at stake there. But when you're talking about simply holding a phone in order to go obtain a warrant, all you're doing is interfering with the possessory interest. And in this case, the possessory interest is even diminished by the fact that it's not the defendant's phones. It's his work phones. Right. So that's one really important limitation. Another limitation is how long you could hold on to the phones. Is it legally significant that it was an employer-issued phone if that was a phone that the defendant had total control over in terms of daily use and operation? Why is that legally significant in the analysis? Right. And we're not making an argument. You're not relying on that, are you? Yes, we are. Not in the sense of standing, Your Honor. So it's not that we're saying at this point the defendant lacks standing to challenge that he has such a. . . Right. Well, what's the significance of that when nobody's arguing that he didn't have control over daily use of that phone? Right. Well, courts have recognized, and I think whether I can't recall now whether it's the Sparks or the Burgard, I think it's the Seventh Circuit's Burgard opinion that referenced that your interest in the phone. . . Well, I'm asking you what your position is. Right. Do you think his interest is diminished because his employer issued that to him? It's a factor in terms of the strength of his argument that the seizure of the phone on the scene was unreasonable. He would not be deprived totally of a means of telephonic communication if he had another phone. Exactly. And it's less of an interference. . . It's an intrusion, but it's less of an intrusion. It's less of an intrusion on his interest to have a employer-owned phone taken away from him for a period of time. And there's also the factor courts have pointed to of the strength of the evidence that this has evidence of a crime. And here I would point out that not only is this an instrumentality, so it was the phone that police had reason to believe was used to take the photos, but it was also containing evidence of a crime. So even if it didn't contain any evidence . . . That it was the phone used to take the photos. What in the record shows that? So there was both the victim and by the time of the seizure, the defendant himself had acknowledged that he was there at the scene, that he was right behind the victim, and that he had these phones with him. And so they had a very firm . . . Did he acknowledge that he had those particular phones with him? I don't know that the record said those particular phones, but that he had phones with him that were his work phones, and that he was leaving. And that would make sense because he was there on the job performing work for National Cash Register at the grocery store. And so it's entirely a logical inference that . . . Let me explain to you what's concerning me, Mr. Cook, if my questions have . . . Sure. Kind of fleshed that out. I'm worried about how we write an opinion to impose some limiting principles. You know, taking what occurred in this case and the passage of time, using Riley, what are the limiting principles that we should be applying here? Because obviously you can't just seize a cell phone under exigent circumstances simply because it has digital content. There has to be more. You know, the police have to have reasonable suspicion regarding the defendant. But what else do we say about that? Well, I think that the Sparks and Burgard cases provide very good guidance. But beyond that, I mean, I would emphasize that this is always inherently going to be a totality inquiry, a totality of circumstances. Exigency cases are always that way. But you have the strength of the evidence. You have the limited delay. You have the fact that it's a seizure, not a search. You have the fact that it's his employer's phones, not his. You have . . . The search of the phone revealed multiple photographs, did it not? It did. That's right. That to me was an important circumstance here because if there had been, you know, a single photograph, as bad as that would have been, it's not the same thing as finding multiple photographs, which reasonably led the police officer to think, well, you know, there's an activity taking place on a larger scale. That's right. Although, in turning to the warrants themselves, I think that it is very important that the police were trying to find out whether there were still images of this victim and what happened to them. By the time they were applying for and getting a warrant, they knew that there was strong reason to believe that there were multiple victims and they were investigating a category of crime, not a particular victim. I mean, they were investigating the victims. There's a tension underlying all these cases, and it's particularly troubling to me in a case like this. And that is that the defendant here is taking advantage of modern technology and cell phone photographs to undertake invasions of privacy of the most egregious sort. I mean, I don't think it's really possible to minimize just what an intrusive action this is and what an invasion of another person's dignity and privacy it is. And he's using technology to facilitate that. And then he turns around and says, oh, no, law enforcement can't take cognizance of that same technology in trying to discover what the breadth of my activities are. It's like privacy for me, but not for thee. And on the one hand, you can't take advantage of all this technology to make these sorts of intrusions and then think that law enforcement cannot even take notice of the mobility of the technology and the advances of the technology and the mobility of the data, the transferability of data in an attempt to get to the bottom of these things. That's the kind of tension that is so troubling because it leads to a one-sided state of affairs. I did not. Judge King had a question, and I didn't want to. No, no, that's okay. But I had a different question. Please. The search warrant was really broad, as the district court recognized. Missed calls, received calls, and then when you got to the search warrant of the residence, that was broader still, as the district court found. She found that it was saved by the good faith exception and that the police didn't act recklessly given the state of the law at the time the search occurred. Can you elaborate a little bit on that? Part of what does, I have to admit, concern me a little bit is that this action in federal court stems from that same 2011, apparently, warrant that was problematic. Can you address good faith for me and why you think it saves warrants that I find extraordinarily broad on their face? Sure. Your Honor is raising a very important point, and I think it actually ties back to something Judge Wilkinson was saying, which is the advances of technology have not led inexorably toward justifications for narrowing searches. For example, here, the technology enables people to send images to many other people, whether it's by email, by text. There's legitimate reasons for law enforcement to want, in a case like this, to be able to identify what happened to these photos. This victim wants to know, this guy took a picture of me. Where did it go? Can you find it? You need to know, because it's typical in a case like this that it might be sent to this defendant's friends. It might be emailed to someone who's running a website. Those kinds of things need to be known. That's one, is just the transmission of the images is a problem. The second thing is, in virtually every one of these computer cases, you need to know who was at the keyboard, who was operating the device. Take just a hypothetical in this case. It's an employer phone. The defendant could say, you found images, but some other employee was using it. You need some circumstantial evidence about the phone usage and what was going on in order to be able to isolate and determine who might be responsible for evidence that you find on there. That's a second way that it becomes really important to have some additional breadth in these warrants. Where is the basis for searching the house? I totally understand the basis for searching the phone, but where is the nexus between what occurred at the Farm Fresh and the search at the home? Just the fact that there are electronic devices in the home? I mean, surely that can't be the sole basis. So what else supports a nexus determination of the Farm Fresh incident or food line? Was it Farm Fresh? Farm Fresh. Yeah, Farm Fresh incident and the search of the home. Well, I think the best piece of evidence concretely in the record on nexus with the home is one that is not in the warrant, but under McKenzie-Gede, this court could consider, which is that at the very time of the offense, this defendant had a laptop under his arm. And that's the Detective Myrick knew that. That's at Joint Appendix 105. And then if you listen to the interview, the defendant says in the recorded statement, he says that I was leaving the facility with my laptop and my BlackBerry in hand. So the police knew, even if it wasn't in the warrant, and it's really an uncontestable fact because it's there in the recording, and the defendant testified to it at the suppression hearing, that he had a computer with him at the time of the offense. You also know that after searching the phones, the police did not find an image of the victim, but the victim believed that she had been photographed. And it was reasonable for them to ask themselves, where are these images? And given the ready transportability of electronic images and the fact that there can be multiple copies of images, it was, in that sense, I think, reasonable. Then you have, and I think the cases that I cited in the 28J letter, the Sixth Circuit's opinion in Pfeffer and this court's unpublished opinion in Wienke, if I'm saying it correct, from earlier this year, make, I think, two important points, which is that computers would be naturally kept at home. And the second is that images of, and Wienke was noting in Doyle, this court cited about child porn, but I think it would apply here to these illegal upskirt photographs, that they would also, it's a natural inference that a defendant might keep something like that at home. So what you're asking us is to assume or to say that there's a reasonable basis for a search of a home just because the images were digital and were not found on the instrument on which they were originally taken. Is that what you're saying? And he's a serial offender and that there are these natural inferences that cases like- When you say serial offender, what did they know at the time they procured the warrant? For the house, they knew that he had come around to, after previous denials, that admitting that there were at least two women that he had photographed who were not his girlfriend that were upskirt photos. So they knew that they hadn't found the victim's photograph and that he admitted that there were two, at least two women that they had found evidence of- Right, but how does that provide evidence to go into his home? Well, so that provides evidence that this guy has been doing this repeatedly and that they are- And that provides the nexus to the search of the home? It does in conjunction with, I mean, again, I think this is one of these totality issues where you have the knowledge that he is using computers and you have- The laptop and the Blackberry. Right, exactly. I'm sorry, go ahead. My understanding is correct, is it not, that at least the second warrant was limited to the devices in the home. Is that not correct? The relevant language is on Joint Appendix 279, and it says, any computer or computer-related storage device to include flash drives, memory devices, external hard- External devices. Right, and the other important point I'd make about the breadth of this language is that it does say that you're searching for, yeah, the unlawful filming. You're sort of asking us to adopt a Williams concept, that you can presume- Right, well, in this court- That somebody who has upskirt photos and admits to having taken some- Right. That they will also be found in the home, isn't that- Right, and I mean, this court has done that, and Williams is an illustration of that. I think that Pfeffer and Wenke, again, if I'm pronouncing it right, as I cited in my 28-J letter, at a minimum provide an easy way for this court to say under good faith that this is a sufficient nexus to survive. I'm sorry. Would the good faith exception extend to file cabinets? How far does this go? Right, well, and I think that's a key point, is take this out of the digital realm. Somebody steals money from a bank in a bank robbery, and you're going to their house. Courts don't say in advance that, as one case put it, you can only look in file cabinets in the basement. They say you can look in the house where money can be hid. And similarly here, the kinds of search protocols that are best used in this area are ones that you talk about a manner of execution after the search, not ex ante limits on the search. The case cited in my 28-J letter, Russian, has a footnote, footnote one, that lays out a whole bunch of authority on this point about limits on searches that are done after the fact. And I apologize, I noticed that. Our cases have allowed us to go directly to the Leon question. Right. We do not need to, sufficient unto the day, and we do not need to write broadly on the underlying breadth or whatever of a warrant. Most of these things, as your argument has pointed out, are very fact specific. There are five or six facts here that might or might not be present elsewhere. But we can go directly to the Leon issue. And in fact, the Supreme Court has encouraged as much in Leon to do that. And the other thing I will come back to is there is an interest here on the part of the victims and just living with the thought that some stranger has taken this sort of photograph and now has it within his power to send it who knows where to further mortification. Not only does someone have this kind of photograph taken, which is bad enough, but there's the thought that this photograph is somewhere in the defendant's possession and at any time it can be sent to any place. And surely in these cases that has to enter in. It's the mobility of all this stuff and the ability to inflict the invasion of people's privacy many times over, the initial invasion and then the dispersion invasion. And, you know, that's just, it can't help but be a part of this. And I don't, you know, I don't, I'm just nervous about writing too broadly on this because it's tied, it seems to me, to specific facts here that we've explored about whether he owns a phone or whether he had a laptop or Blackberry or how many phones or how many photographs were found in the search of the phone and the rest. But there are numerous cases and the Supreme Court encouraged, if you read Leon, the Supreme Court encouraged it that where an officer gets warrants, and he seemed to get a warrant at every stage of the investigation after the initial seizure, and where an officer is that conscientious, you can make a determination under Leon. We don't have to say this warrant was great. We don't have to say that. We can just say that, you know, this is sufficiently fluid and the whole area is sufficiently fluid. As Judge Duncan's question pointed out about the changing nature of all this technology, and if the whole area is sufficiently fluid, how can we expect a police officer to be second-guessing the magistrate's determination? This police officer is not a bad actor. I wish all police officers were as conscientious in getting a warrant for searching the cell phone and a warrant for searching the home. You know, he tried to play it by the book. That's got to be good faith. I agree, Your Honor. I see my time is up. If the court has no further questions, I'll just ask that the court affirm. Thank you. Barbara. Thank you. Thank you. Very briefly, I just have a couple of points, and I will address Williams, but I want to take the points in sequence. First, the government relied on Kentucky v. King for the exigency argument, but King clearly requires an imminent risk of destruction, and that wasn't present here. And even the Supreme Court's recent case in McNeely says that the dissipation of alcohol in someone's blood is not automatically an exigency that allows the police to proceed. So turning particularly to the nexus between the alleged incident and the search of the home, and the reason that this case I think is distinguishable from Williams, and we've discussed that in the briefing, and ultimately we don't think that Williams is even good law anymore, but even if Williams still stands, the distinction here is that in Williams there were threats, direct threats, written threats, and so the police were allowed to search through someone's home computers for evidence not only that he made those threats, but also what his motives might have been if they were true threats that the police had to take action on. But here, the warrant affidavit doesn't draw that connection, and I will correct something the government said about the scope of the warrant. It was not just digital files. It also listed printed photographs, which would have allowed them to look at every single piece of paper in his home, whether it was on the computers or not. It was really a rummage general warrant allowing them to search wherever they wanted. And then finally, the last point that I'll make, Your Honor, is I understand the court's concern about the tension between a citizen's privacy rights and the demands of the Fourth Amendment, but respectfully, Your Honor, you use the phrase it's a one-sided state of affairs. The Constitution is one-sided. The Constitution protects Mr. Burton's rights. The Constitution isn't one-sided. The touchstone of the Fourth Amendment is reasonableness. To protect Mr. Burton. The overall question is one of reasonableness, and that is a balance. Well, and that's why we have the good faith exception, which I understand, but that's not limited either. The good faith exception itself has exceptions. When a warrant is so overbroad that it's a general warrant. All you need to do is go back and read Leon and the emphasis that the court puts on the fact that it's going to be rare indeed where a court's going to look behind a warrant that an officer got because you want officers to get warrants. And they stress that where officers got a warrant, it's rare indeed that we would say the officer had to second-guess a judicial officer. I'll concede that it should be rare, but the point is there are going to be situations, and this is one where the warrant was so broad that it was a general warrant and the officer should have known that. If there are no other questions, we'd ask this court to reverse the district court. Thank you. Thank you. We'll come down and recounsel and then we'll take a brief recess.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Barbara Milano Keenan